CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

JUL 2 0 2009

JOHN F. CORCORAN, CLERK
BY: /s/
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| FEDERAL INSURANCE CO., *Plaintiff,* <br><br> v. <br><br> STEWART PARNELL, *et al.,* *Defendants.* | CIVIL NO. 6:09CV00033 <br><br> **MEMORANDUM OPINION** <br><br> JUDGE NORMAN K. MOON |

This matter is before the Court on Plaintiff Federal Insurance Company's Motion to Dismiss Defendant Stewart Parnell's Counterclaim. Parnell's Counterclaim, which is pled "in the alternative" to his Statement of Claim to the interpled funds in this action, seeks to recover damages from Federal on the grounds that it breached a contract to pay Parnell's legal fees *outside* of the limits already set forth in a directors' and officers' insurance policy. Because the allegations in the Counterclaim are implausible and fail to set forth the prima facie elements of breach of contract, however, Federal's Motion to Dismiss will be granted in a separate Order to follow.

### I. BACKGROUND

#### A. THE SALMONELLA OUTBREAK

In late 2008, the Center for Disease Control and Prevention identified an outbreak of a strain of *Salmonella* Typhimurium linked to the infections of hundreds of people in over forty different states. A subsequent investigation by the Minnesota Departments of Agriculture and Health in early 2009 linked the salmonella strain to a brand of peanut butter produced by the Peanut Corporation of America ("PCA") at its Blakely, Georgia plant. In January 2009, the U.S. Food and Drug Administration ("FDA") commenced a

1

multiple-day regulatory inspection and later issued a report identifying the presence of salmonella at the Blakely plant. In consultation with the FDA, PCA eventually recalled more than 1900 peanut butter products that had been processed at the facility.

In the midst of the FDA inspection, the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce of the U.S. House of Representatives ("Subcommittee") sent Parnell – then the President, CEO, and part owner of PCA – a letter informing him that it had commenced a regulatory oversight proceeding designed to investigate the safety of the nation's food supply and directing him to provide specific information and documents in a "detailed written submission." Ten days later, Parnell received another letter from the Subcommittee requesting his testimony at a hearing, scheduled for February 11, 2009, concerning the salmonella outbreak. A follow-up letter sent to Parnell requested that PCA produce several specific documents in advance of the hearing. On January 30, 2009, the U.S. Department of Justice and the FDA Office of Criminal Investigations announced the commencement of a criminal investigation of PCA and its operations. Members of Congress and the Governor of Georgia later made statements calling for possible criminal charges and "for individuals to be held accountable."

B. PCA'S DIRECTORS' AND OFFICERS' INSURANCE POLICY

PCA holds an insurance policy with Federal Insurance Company ("FIC") that provides corporate liability coverage for PCA and covers "claims" made against PCA executives and employees.[1] The Policy has an aggregate liability limit of $1 million and

---

[1] Under the Policy, a "claim" includes a "D&O (directors' and officers') Claim," which is defined as:
(1) any of the following:
    a.   a written demand for monetary damages or non-monetary relief;
    b.   a civil proceeding commenced by the service of a complaint or similar pleading;

2

was originally issued for the period of December 20, 2007 to December 20, 2008 and subsequently extended to April 10, 2009. As a result of legal defense fees incurred in connection with the events described above, Parnell contacted FIC in January 2009 to obtain coverage under the Policy. According to Parnell, FIC concurred that a "claim" had occurred under the terms of the Policy and agreed to pay the law firm of Gentry Locke Rakes & Moore, LLP ("Gentry Locke") to represent Parnell in connection with the "claim." FIC allegedly also later gave Gentry Locke permission to employ another law firm – Jones Day – to represent Parnell on the "claim."

After allegedly obtaining the go-ahead from FIC, Gentry Locke and Jones Day began working with Parnell to prepare for the February 11th hearing before the Subcommittee and commenced discussions with criminal investigators on Parnell's behalf. On February 6th, counsel for Parnell sent the Subcommittee a formal notice stating their position that it was not appropriate for Parnell to appear at the hearing in light of the pending criminal investigation of PCA. On February 10th, the Subcommittee issued a subpoena commanding Parnell to appear at the hearing the following day. At the hearing, Parnell declined to testify, invoking his Fifth Amendment privilege against self-incrimination.

On February 20th, FIC allegedly reversed its earlier position that Parnell had a qualifying "claim" under the terms of the Policy and informed him that it would not pay

---

      c.  a criminal proceeding commenced by a return of an indictment; or
      d.  a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;
Against an Insured Person for a Wrongful Act, including any appeal therefrom; or
(2) A formal civil, criminal, administrative or regulatory investigation commenced by the service upon or other receipt by the Insured Person of a written notice from the investigating authority specifically identifying the Insured Person as a target individual against whom formal charges may be commenced…

3

for his legal expenses up to that date. Parnell claims he amassed approximately $359,000 in legal fees between the date of FIC's initial alleged authorization and February 20th.

C. FIC'S INTERPLEADER COMPLAINT & PARNELL'S COUNTERCLAIM

On March 19, 2009, anticipating that the demands of Parnell and other PCA executives and employees for Policy proceeds would far exceed the $1 million maximum aggregate limit for the relevant Policy period, FIC filed an interpleader action in U.S. Bankruptcy Court for the Western District of Virginia, where PCA had previously filed a Chapter 7 bankruptcy petition. The reference of the interpleader action to Bankruptcy Court was withdrawn by this Court on June 9th (docket no. 2). Consequently, Parnell's Counterclaim and FIC's Motion to Dismiss, both originally filed in Bankruptcy Court, are now before this Court for review. Parnell and several other former PCA executives and employees have also filed Statements of Claim to the interpled funds.

While Parnell's Statement of Claim seeks access to the Policy funds to cover his legal expenses on the theory that a "claim" accrued under the terms of the Policy, his Counterclaim seeks reimbursement *outside* Policy limits for the $359,000 amassed in legal fees up until February 20th on an "alternative" breach of contract theory "to the extent that the court disagrees with any contentions in the statement of claim."[2] In its Motion to Dismiss, FIC argues that Parnell's Counterclaim is an improper form of alternative pleading that should be dismissed because it: (1) fails to properly plead the elements of an implied or express contract to pay funds outside Policy limits; (2)

---

[2] Parnell also explains, in his Memorandum in Opposition to FIC's Motion to Dismiss, that "[i]f this Court ultimately determines that there was a claim as defined in the Policy and that the representation at issue stemmed from such claim(s), this counterclaim necessarily fails. If, however, this court determines that a claim had not taken place it is the purpose of this counterclaim to assert Mr. Parnell's right to sue for breach of contract."

4

improperly rests on assertions that Parnell represents as false in his Statement of Claim to the interpled funds; and (3) is barred by the Interpleader Act.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (internal citations omitted). A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). "Factual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor. *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 346 (4th Cir. 2005). Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Consequently, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009).

5

## III. DISCUSSION

Parnell claims that the allegations contained in the Counterclaim are pled in the alternative to those in the Statement of Claim and should essentially only apply in the event that the Court determines that a "claim" never occurred under the terms of the Policy. Assuming that the Court eventually determined that Parnell did not have a "claim" entitling him to any of the interpled funds and then took up the allegations in the Counterclaim, however, it would be faced with a purely implausible theory – that FIC somehow entered into a contract with a Gentry Locke, with Parnell as the third party beneficiary, to fund Parnell's legal costs *outside* of Policy limits. The Counterclaim should be dismissed not only because it is implausible and even inconceivable, but also because it fails to sufficiently allege the prima facie elements of such a contract.

In order for a contract to exist, "there must be a complete agreement including acceptance of an offer as well as valuable consideration." *Snyder-Falkinham v. Stockburger*, 249 Va. 376, 381, 457 S.E.2d 36 (Va. 1995). In the Counterclaim, Parnell never alleges that FIC offered to pay Gentry Locke funds outside the limits of the Policy. Instead, he alleges that FIC first "took the position that a 'claim' had occurred under the terms of the policy" but later reversed that position and "indicated it would not pay for the legal costs incurred to that point." By claiming that FIC first agreed to pay under the Policy and then decided not to pay anything at all, Parnell's Counterclaim necessarily belies any plausible contract theory based on an agreement to pay *outside* Policy limits. According to the allegations in the Counterclaim, there was never any offer by FIC to pay for Parnell's defense costs irrespective of whether there was a covered "claim" under the terms of the Policy. For this reason alone, Parnell's Counterclaim should be dismissed.

6

Parnell argues that he was the intended third party beneficiary of a contract between FIC and Gentry Locke, whereby Gentry Locke agreed to represent Parnell and to submit to oversight by FIC in exchange for compensation by FIC. Parnell also claims that he gave consideration for the deal by accepting the representation provided to him by FIC instead of choosing his own counsel. Assuming that FIC decided that Parnell had no "claim" under the Policy and was not entitled to Policy funds for his legal defense, it is implausible and even inconceivable to imagine that FIC would ever agree to the type of gratuitous liability that Parnell's Counterclaim alleges. Furthermore, it is settled law in Virginia that "an express contract defining the rights of the parties necessarily precludes the existence of an implied contract of a different nature containing the same subject matter." *S. Biscuit Co., Inc. v. Lloyd*, 174 Va. 299, 6 S.E.2d 601, 606 (Va. 1940); *see also Jafari v. Old Dominion Transit Mgmt. Co.*, 2008 U.S. Dist. LEXIS 97037, at *25-*26 (E.D. Va. Nov. 26, 2008). The very existence of the Policy, which was complete with very specific provisions setting forth the terms under which FIC would advance money for defense costs, thus completely undercuts the assertion that there was some implied contract that obligated FIC to make payments *outside* of Policy limits.

While the Counterclaim is replete with allegations that might support a plausible claim of promissory estoppel[3] under the circumstances, Virginia law does not recognize such a cause of action (as Parnell concedes). *W.J. Schaefer Assocs., Inc. v. Cordant, Inc.*, 254 Va. 514, 521, 493 S.E.2d 512 (Va. 1997). For this reason, and because the

---

[3] *See* Counterclaim, ¶ 22 ("Parnell was utilizing the legal representation of Gentry Locke…with reliance upon Federal's representations that a 'claim' had taken place"); ¶ 28 ("All of these legal fees were expended at the direction of Federal upon Federal's assertion that the policy applied to the work being done. Mr. Parnell relied upon these representations…as he made use of the legal representation provided to him by Federal"); ¶ 29 ("Were it not for Federal's misrepresentation that the policy applied to the legal defense work being done, these expenses would not have accrued. Were it not for Mr. Parnell's reliance upon the representations of Federal, the approximately $359,000.00 in fees would not have been incurred").

7

allegations fail to set forth a plausible prima facie case of breach of contract, Parnell's Counterclaim fails to state a claim for which relief can be granted and will be dismissed.

It is so **ORDERED**.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this 20th day of July, 2009.

                                                NORMAN K. MOON
                                                UNITED STATES DISTRICT JUDGE